**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 2:24-cv-14064-SMITH/Strauss**

SEAN WESTLEY SCOTT,

*Plaintiff*,

v.

RICKY DIXON, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

*Defendant*.

_______________________________________/

**OPINION AND ORDER**

This matter comes before the Court on a bench trial conducted on February 2–4, 2026. It concerns Plaintiff Sean Westley Scott's ("Plaintiff") claim against Defendant Ricky Dixon, Secretary of the Florida Department of Corrections ("Defendant"), alleging violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA" or the "Act"), as applied to Plaintiff. Plaintiff asserts that Defendant's actions in connection with enforcing the Defendant's grooming policy, administered under Florida Administrative Code Rule 33-602.101(4) (the "Grooming Policy"), substantially burden Plaintiff's religious exercise in violation of the rights protected by, and codified in, the Act, 42 U.S. Code §2000-cc, *et seq*.

Having heard, reviewed, and considered the evidence presented, the arguments of counsel, and the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law:

## I. BACKGROUND

On March 5, 2024, after exhausting all available administrative remedies, including administrative appeals, Plaintiff, proceeding *pro se*, filed his Complaint seeking a permanent

injunction against Defendant's enforcement of the Grooming Policy. Plaintiff stated that the Grooming Policy, as applied to him, violates RLUIPA in light of his sincere religious beliefs and adherence to Islam, which requires him to trim his mustache and grow a free-flowing beard, or at minimum, fist-length. On the same day, *pro se* Plaintiff filed a Motion for Preliminary Injunction, requesting that the Court temporarily enjoin Defendant from enforcing the Grooming Policy against him. Plaintiff further elaborated on the basis for the injunction and Defendant's alleged violation of RLUIPA, explaining that Islam requires its adherents, including Plaintiff, to follow the commands of Prophet Muhammad, and to follow the practices of his companions. Plaintiff asserted that, failure to do so subjects one to eternal hellfire.

## II. LEGAL STANDARD

A movant must establish the following four factors for a permanent injunction: (a) the movant will suffer irreparable injury; (b) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (c) the threatened injury to movant outweighs any damage to the opposing side; and (d) the permanent injunction serves the public interest. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *XYZ Corporation v. Individuals, Partnerships, and Unincorporated Associations Identified on Schedule "A"*, No. 22-CV-24022, 2023 WL 2815123 (S.D. Fla. Apr. 5, 2023).

## III. FINDINGS OF FACT

Plaintiff, Sean Westley Scott, is a 38-year-old Muslim man who has been incarcerated since 2018. Consistent with his Islamic beliefs and practices, Mr. Scott has adopted the name "Abdulmalik," which means "one who submits to the King." (2/2/26 Tr., S. Scott, 26: 12-22; 31:4-5.)[1] Plaintiff is currently serving a 15-year prison term and is expected to be released on March 5,

[1] The Court identifies citations to the trial transcript by the date and the name of the person testifying.

2032. (2/2/26 Tr., S. Scott, 31: 8-11.) Since Plaintiff's incarceration, he has been housed at various prisons throughout the State of Florida, including incentivized and program-based prisons, such as Marion Correctional Institution and Moore Haven Correctional Facility. (2/2/26 Tr., S. Scott, 31: 14-25; 33:3-7.) To be eligible for placement at an incentivized facility, such as Marion Correctional Facility, inmates must remain free of disciplinary reports for an extended period. Plaintiff qualified for and was transferred to Marion Correctional Facility because he incurred no disciplinary reports from 2018, the year of his incarceration, through 2020, the year of his transfer. (2/2/26 Tr., S. Scott, 33:18-20; 34:11-24.) Since his incarceration and continuing to the present, Plaintiff has never been disciplined for any violent behavior. He attributes this to his adherence to Islam, which he states teaches "peace." (2/2/26 Tr., S. Scott, 35:24-25; 36:1; 36:14-16.)

**A. Plaintiff's Religious Conversions**

Prior to his incarceration in 2018, Plaintiff was not a Muslim. He was raised Christian and later began practicing Moorish Science in 2017. At the time of his incarceration, Plaintiff was still practicing Moorish Science, which he believed to be a sect of Islam and whose adherents identify as Muslims. (2/2/26 Tr., S. Scott, 52:23-25; 53:2-4; 53:15-24; 54:17-20.) Plaintiff practiced Moorish Science from 2017 to 2019. Plaintiff later came to understand that the religious tenets of Moorish Science materially differ from those of Sunni Islam. Amongst other differences, unlike Sunni Islam, Moorish Science does not require its male adherents to grow a beard. (2/2/26 Tr., S. Scott, 56:24-25; 57:7-14.) Toward the end of 2019, more than a year and a half after his incarceration, Plaintiff testified that he converted to Sunni Islam and took his *Shahada*, the required oath before two Muslim witnesses. This conversion followed his realization that the teachings of Moorish Science were not truly Islamic and that its adherents were not, in fact, Muslims. (2/2/26 Tr., S. Scott, 57:15-23; 58:18-24; 59:3-7.)

In connection with his conversion, Plaintiff came to understand that Moorish Science was different from Islam for several reasons, including: (i) Islam requires the taking of the *Shahada* as part of conversion, which is not a practice in Moorish Science; (ii) Moorish Science uses the "Circle Seven *Qur'an*," which differs from the *Qur'an* used in Islam; (iii) Moorish Science follows a prophet named Drew Ali, who is not recognized as a prophet in Islam; and (iv) the *Qur'an* teaches that the Prophet Muhammad is the seal of all prophets, which conflicts with the teachings of Moorish Science, which follows Drew Ali. (2/2/26 Tr., S. Scott, 54:10-16; 55:7-12; 56:3-16; 57:17-25; 58:1-3.) In addition to being a Sunni Muslim, Plaintiff subscribes to *Salafism* — a traditional Islamic methodology that emphasizes adherence to the earliest and purest form of Islam, tracing its origins to the first three generations of Muslims, *Al Salaf al-Salih*. (2/2/26 Tr., S. Scott, 61:6-9; 61:24-25; 62:1-11.)

Plaintiff was introduced to *Salafism* towards the end of 2021 and committed fully to it in 2022. (2/2/26 Tr., S. Scott, 61:10-14.) Since Plaintiff's conversion to Islam while incarcerated, he has fully submitted himself to the practice of Islam to the best of his ability, including, without limitation: (i) consistently attending *Jumu'ah* (Friday) prayers, Eid prayers, *Taleem* religious classes, and other congregational Islamic services held at the institution; (ii) praying five times a day; (iii) fasting during *Ramadan* and observing additional voluntary fasts; (iv) completing the Wellness Education Program in support of his rehabilitation; and (5) residing in a Faith & Character-Based Dormitory. (2/2/26 Tr., S. Scott, 63:14-15; 70:18-25; 72:4-15; 78:3-4; 80:9-12.)

At trial, Plaintiff made clear that his religious beliefs require him to emulate the Prophet Muhammad and to follow his companions, who wore beards and trimmed their mustaches, and that these beliefs require him to grow his beard and trim his mustache. (2/2/26 Tr., S. Scott, 80:17-25; 81:1-8.) During each day of trial Plaintiff was present, he wore a *kufi*, which is also a

requirement under his religious beliefs. Also during the trial, when asked whether his inability to grow a beard due to the restrictions imposed by the Grooming Policy affects his salvation, Plaintiff testified in the affirmative, stating: "[o]f course. Because it is a disobedience to Allah." (2/2/26 Tr., S. Scott, 83:1-3.)

Plaintiff testified that, in Islam, disobedience to Allah subjects one to "severe punishment," including "the hellfire." (2/2/26 Tr., S. Scott, 83:4-6.) When asked whether he currently believes he is subject to severe punishment and the hellfire because of his disobedience to Allah in connection with not growing his beard, Plaintiff again answered in the affirmative. (2/2/26 Tr., S. Scott, 83:7-9.) Plaintiff further stated that the Department's Grooming Policy prevents him from properly and freely practicing his religion, a circumstance that affects his faith and other components of Islam. (2/2/26 Tr., S. Scott, 82:1-12.) He explained that his faith is lowered through acts of disobedience, such as not growing his beard and trimming his mustache. (*Id.*) When his faith is lowered as a derivative by-product of disobedience, he is less able to focus on prayer and is affected in other aspects of his religious practice. (*Id.*) In sum, Plaintiff articulated that disobedience in one aspect of his religious practice creates a cascading, rippling effect throughout his faith. (2/2/26 Tr., S. Scott, 82:3-17.) In explaining the "rippling effect," Plaintiff stated: "faith is of three types: belief in the heart, statement of the tongue, and action of the limbs. So your actions, outward actions have an effect on your inward belief . . . so when you do more acts of disobedience, it weakens your faith on the inside and can ultimately lead you to being a hypocrite or apostating [*sic*] out of Islam." (2/2/26 Tr., S. Scott, 82:17-19.)

### B. Religious Maturity and Grievance Process as the Basis for the Timing of Plaintiff's Claim

The Court denied Plaintiff's Motion for Preliminary Injunction on January 17, 2025. (DE 46.) In the Preliminary Injunction Order, the Court explained that the denial was based on the fact

that Plaintiff had been incarcerated since November 29, 2018, and his request for a preliminary injunction was filed nearly six years later, failing to satisfy the "reasonable due diligence" requirement necessary for the issuance of a preliminary injunction. (*Id*. at 2.) However, after hearing Plaintiff's testimony at trial, which included the timeline of his religious conversions and considering all evidence presented, the record has been made more clear: Plaintiff did not enter prison as a Muslim, and that it was not until his conversion to Sunni Islam at the end of 2019 and his adoption of Salafism in 2021–2022 that he understood what he perceives to be a requirement under Islam to grow a beard and trim his mustache. As a result, the Court finds that in this particular case, the date of his incarceration is not the appropriate benchmark for measuring reasonable diligence.

Even after converting to Sunni Islam, Plaintiff testified that he did not fully understand what was required of him as a Muslim. It was not until after 2022, when Plaintiff delved into *Salafism*, read Islamic literature, continued to attend *Jum'ah* prayers and *Taleem* classes, and immersed himself in Islam, that he came to understand the requirements of his faith, including the requirement to grow his beard and trim his mustache. (2/2/26 Tr., S. Scott, 69:3-17; 70:14-25.) As time progressed during his incarceration, Plaintiff deepened his religious knowledge and faith. As his faith developed, so too did his desire to perfect his religious practice. (2/2/26 Tr., S. Scott, 80:1-3.)

The Court also notes that Plaintiff's Chapel Attendance Records were admitted into the record and reflect his religious attendance. These records are from Okeechobee Correctional Facility, where Plaintiff has spent the majority of his sentence to date. They document each religious service or event Plaintiff attended and show that he regularly attended *Taleem* (Islamic education) and *Jumu'ah* (Friday) prayers and observed *Ramadan* from 2022 through 2025,

reflecting three years of consistent Islamic practice. (2/2/26 Tr., S. Scott, 71:6-23; 72:16-22; *see also* Trial Exhibit 7.)

As to the grievance process, the record reflects that Plaintiff was not immediately informed of his legal rights to challenge a policy or to submit grievances through the Department's formal grievance procedures. (2/2/26 Tr., S. Scott, 44:3-5; 83:20-25.) Once Plaintiff became aware of the possibility to challenge a policy of the Department, he submitted a grievance. His first grievance challenging the Grooming Policy was submitted in 2021, shortly after he began following the *Salafi* methodology. Accordingly, Plaintiff submitted the grievance at or near the time he recognized the importance of his perceived religious belief, thereby demonstrating due diligence. (2/2/26 Tr., S. Scott, 84:3-5; 84:18-20; 85:7-9 (**[Q:]** So your first grievance was submitted shortly after you started following the *Salafi* methodology? **[A:]** Yes).)

Notably, when asked whether he would have submitted a grievance had he been aware of the grievance policy earlier, Plaintiff stated, "I don't believe so because I didn't understand the most seriousness of my actions of growing a beard." Plaintiff testified that he did not understand the seriousness of growing a beard until 2021–2022. (2/2/26 Tr., S. Scott, 86:2-8.) As a result, the Court finds that Plaintiff's delay in asserting his claim was attributable to the deepening and maturation of his religious understanding and his introduction to *Salafism* in 2021, followed by his adherence in 2022. As Plaintiff's religious understanding evolved, he came to realize the obligation and religious importance of maintaining a free-flowing or first-length beard in accordance with what he believes to be the authentic and earliest teachings of Islam. (2/2/26 Tr., S. Scott, 85:14-22; 86:4-8.)

**C. Plaintiff's Sincerely Held Religious Belief**

Plaintiff testified that he is a devout Muslim, and his religious beliefs are derived from the holy *Qur'an*, authentic Hadiths, and rulings from Salafi scholars, including Sheikh Ibn Baz, Sheikh al-Albani, and Sheikh Ibn Uthaymeen. (2/2/26 Tr., S. Scott, 62:1-23; *see also* DE 52 – Pl.'s Mot. for Summ. J. at 5; *see also* DE 104 – Am. Joint Pretrial Stip. at 5 (Section I).) Upon taking the *Shahada*, Plaintiff enrolled in *Taleem* courses in prison and learned Arabic while at Marion Correctional Institution in order to read the *Qur'an* and pray in Arabic, the language of *Allah*. (2/2/26 Tr., S. Scott, 59:3-4; 15-24; 60:3-9; 60:12-22.) Plaintiff testified that Islam is fundamental to him, stating that it means everything to him and is his life. (2/2/26 Tr., S. Scott, 64:20-23.)

As an observant Salafi Muslim who has grown and matured in his faith, Plaintiff has come to recognize and observe the practices and tenets of Islam. Plaintiff's sincerely held beliefs include that, under Islam: (i) one must follow the pillars of Islam and believe in *Allah*; (ii) one must pray five times daily; (iii) one must follow and emulate the Messenger of *Allah*, the Prophet Muhammad; (iv) one must fast during the holy month of Ramadan; (v) one must adhere to cleanliness obligations as set forth in *Sunan al-Fitrah*; (vi) male adherents must grow a free-flowing beard, or at a minimum a fist-length beard, and trim the mustache;; (vii) male adherents must wear a *kufi*, or a head covering; and (viii) one must refrain from committing sin. (2/2/26 Tr., S. Scott, 63:9-17; 66:11-25; *see also* DE 52 – Pl.'s Mot. for Summ. J.)

As a Salafi Muslim, the requirement to practice Islam in its purest, most unadulterated form is fundamental. As stated by Plaintiff, Salafi is

> strict adherence to the way the Prophet did everything […] we pray how the Prophet Muhammad, *alayhi wa sallam*, prayed, in the exact way that he prayed […] He sleeps on his right side, so we sleep on our right side. He told us to grow a beard, so we grow a beard. He told us to trim our mustache, we trim our mustache […] It's the strict adherence. He prayed five times a day, we pray five times a day

(2/2/26 Tr., S. Scott, 62:3-4; 63:9-15.) In addition to the foregoing, Plaintiff submits that there are certain religious tenets of Islam from which he is effectively exempt because he is physically unable to perform them and cannot seek an exemption. These tenets include: (i) the obligation to give *Zakat* (charitable donations), due to his lack of earnings while incarcerated; and (ii) the obligation to perform *Hajj*, the holy pilgrimage to Mecca, Saudi Arabia, which is required once in a lifetime. (2/2/26 Tr., S. Scott, 73:8-13.)

Plaintiff clarified that, in Islam, exemptions apply only to physical inability for matters outside an adherent's control. For example, physical inability includes not being able to stand for prayer if one has a broken leg. (2/2/26 Tr., S. Scott, 76:25; 77:1-2.) Plaintiff distinguished physical inability from procedural inability. He explained that he is physically capable of growing his beard but is prevented from doing so by the Grooming Policy, despite other Muslim prisoners in the State of Florida having fist-length and free-flowing beards. (2/2/26 Tr., S. Scott, 75:14-24; 76:3-7.) While incarcerated, Plaintiff has followed all of the foregoing Islamic tenets to the best of his ability (except for *Zakat*). Plaintiff noted that although he is currently unable to perform *Hajj* due to his incarceration, that obligation is not presently triggered and is required only once in a lifetime, which he intends to fulfill upon his release. (2/2/26 Tr., S. Scott, 75:1-10.)

Plaintiff also adheres to a halal diet to the extent possible based on the food made available to him by the Department and offered at prison. (2/2/26 Tr., S. Scott, 112:21-24; 113:1-3.) Despite being Muslim, Plaintiff is not provided with accommodations for a halal diet. Instead, Defendant offers inmates a "Religious Diet" designed to comply with kosher dietary laws under Judaism. Although kosher and halal diets share certain similarities, they are not the same. The "Religious Diet" offered by Defendant restricts inmates, including Muslims, from purchasing halal items from the canteen—items that Muslims would otherwise be able to consume. Plaintiff is not enrolled in

the Religious Diet Program. If Plaintiff were to enroll in Defendant's "Religious Diet," he understands that he would be prohibited from consuming halal items. (2/2/26 Tr., S. Scott, 113:19-25; 114:1; 145:15-18 (**[Q:]** So if you were to subscribe to the prison's or the Department's religious diet, you would be prohibited from eating certain halal items; is that correct? **[A:]** Yes, sir.).)

At trial, Defendant called Reverend John Darbyshire as a fact witness, to testify regarding the Department's Religious Diet Program, the religious practices used in preparing kosher and halal foods, and prison demographics, including the relative number of Jewish and Muslim prisoners. From the outset, the Court finds Rev. Darbyshire's testimony not particularly relevant for multiple reasons. First, Rev. Darbyshire was not fully familiar with the rules governing halal food preparation and slaughter, and therefore his opinions and testimony regarding proper halal practices are unsupported. (2/2/26 Tr., J. Darbyshire, 10:12-18.)

Second, Rev. Darbyshire was offered to describe the Department's Religious Diet Program, which is based on kosher dietary laws specific to Judaism. Plaintiff is Muslim, and adherence to a kosher diet is not an Islamic tenet. Although there may be similarities between kosher and halal diets, kosher is not halal, and Plaintiff's decision not to participate in the Department's Religious Diet has no bearing on his burden to establish the sincerity of his religious beliefs. (2/2/26 Tr., J. Darbyshire, 165:15-20.)

Third, Rev. Darbyshire testified that he has (i) never personally observed Plaintiff consume any food that violates the Islamic halal diet; (ii) never inquired with prison staff whether they have observed Plaintiff consuming any such food; and (iii) did not take steps, in preparation for trial, to investigate whether any other prisoners or eyewitnesses observed Plaintiff consume any food that violates the Islamic halal diet. (2/3/26 Tr., J. Darbyshire, 11:8-22; 12:3-7.)

## III. CONCLUSIONS OF LAW[2]

### A. Plaintiff's Burden of Proof Under RLUIPA

To prevail on his RLUIPA claim, Plaintiff must first show that the half-inch-beard policy substantially burdens his sincere religious exercise. *See Holt v. Hobbs*, 574 U.S. 352, 360, (2015); 42 U.S.C. § 2000cc-1(a). Under RLUIPA, the challenging party bears the initial burden of proving that: (i) his religious exercise is grounded in a sincerely held religious belief; and (ii) that the government's actions substantially burden the challenging party's religious exercise. *Holt*, 574 U.S. at 352-53.

Here, the Department disputes Plaintiff's sincerity and that growing a beard is a religious exercise. But more notably, the Defendant disputes that its policy substantially burdens that exercise. The Department points to Plaintiff's statement that he can shave if necessary for his health or safety. However, determining the contours of a religious exercise is the province of the religious adherent, not the state. Plaintiff's religion calls for a fist-length beard all the time, with a narrow exception for circumstances that do not now exist.

The record evidence before the Court demonstrates that Plaintiff, among other things: (i) resides in a faith-and-character-based dormitory; (ii) understands the religious tenets and obligations of Islam, including the requirement to pray five times daily; (iii) attends *Jumu'ah* (Friday) prayers; (iv) observes religious fasts, including during the holy month of *Ramadan*; and (v) reads Islamic texts. For Plaintiff, failure to comply with Islam's beard and mustache

[2] The Court notes that both the Northen District of Florida and the Middle District of Florida have permitted incarcerated Muslim men to grow fist-length and free-flowing beards with trimmed mustaches, holding that, under RLUIPA, the Department's Grooming Policy substantially burdened those Muslim prisoners' sincerely held religious beliefs. (S. Scott, 75:22-24; *see also Sims v. Inch*, 400 F. Supp. 3d 1272, 1280 (N.D. Fla. 2019); *see also Shabazz v. Dixon*, Case No. 2:17-cv-648- JES-NPM (M.D. Fla. 2023).) While this Court has reviewed the *Sims* and *Dixon* decisions and finds the reasoning therein persuasive, the Court makes clear that its decision is based on the facts and circumstances specific to this case and to Plaintiff.

requirement constitutes a sin, as it prevents him from following and emulating Prophet Muhammad.

Although Plaintiff has demonstrated his devotion and adherence to Islam, Defendant challenges it on a single ground: Plaintiff's testimony that Islam permits exemptions to certain religious tenets if the adherent is physically unable to perform them or if performance would cause undue hardship or harm. Defendant's challenge to Plaintiff's religious sincerity fails. Plaintiff has testified that his adherence to Defendant's Grooming Policy stems from a fear of disciplinary action or reprimand. His compliance with the Policy is undertaken solely to follow the rules of Defendant and does not constitute a waiver of his religious exercise.

It is well-established that courts may not second-guess the "correctness" of an individual's religious understanding. As the Supreme Court has made clear, religious beliefs "need not be accepted, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Dorman v. Aronofsky*, 36 F.4th 1306, 1313 (11th Cir. 2022) (recognizing that RLUIPA provides even broader protection). Plaintiff has explained that while the Prophet's practice informs his belief, other companions of the Prophet wore fist-length beards and were permitted to do so, and that understanding governs his own exercise. That is sufficient as a matter of law.

Based on the foregoing, Plaintiff has established that his religion, which requires him to grow a free-flowing or, at minimum, fist-length beard with a trimmed mustache, is grounded in a sincerely held religious belief and not motivated by any other reason. *See Holt*, 574 U.S. at 360-61 (holding that petitioner's request for an accommodation under RLUIPA must be sincerely based on a religious belief and not some other motivation).

Moreover, given the Court's review of the testimony and record evidence the Court finds that the Department's policy substantially burdens Plaintiff's religious exercise. As recognized in *Holt* and applicable here, Defendant's Grooming Policy requires Plaintiff to shave his beard and engage in conduct that seriously violates his religious beliefs. *See id*. (holding that a prison's grooming policy requiring a Muslim prisoner with a sincerely held religious belief to shave his beard forces him to "engage in conduct that seriously violates his religious belief"). Notably, if Plaintiff were to violate Defendant's Grooming Policy by growing his beard, he would face disciplinary action. Because the Policy places Plaintiff in this position, it substantially burdens his religious exercise. Accordingly, Plaintiff has satisfied the two elements of his RLUIPA claim, shifting the burden to Defendant to show that its Grooming Policy does not violate RLUIPA as applied to him.

**B. Defendant's Burden of Proof in Response**

Because Plaintiff has shown the Defendant's policy substantially burdens his religious exercise, the burden is on the Defendant to show that the refusal to allow Plaintiff to grow a fist-length beard is the least restrictive means of furthering a compelling government interest. *Id.* at 362-63; 42 U.S.C. § 2000cc-1(a). The Department must satisfy this test through the policy's application to Plaintiff specifically. *See Holt*, 574 U.S. at 363; *see also Smith v. Owens*, 848 F.3d 975, 981 (11th Cir. 2017). In assessing the Defendant's reasons, the court must consider the harm it will suffer from granting Plaintiff an exemption and "'look to the marginal interest in enforcing' the challenged government action" in the particular context." *Holt*, 574 U.S. at 363 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726, (2014)).

Relevant here, RLUIPA "does not give courts *carte blanche* to second guess the reasoned judgments of prison officials." *Knight v. Thompson*, 797 F.3d 934, 945 (11th Cir. 2015). Congress

"anticipated . . . that courts entertaining complaints under [RLUIPA] would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter v. Wilkinson*, 544 U.S. 709, 716-17, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005) (quoting 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy)). But the court need not defer to speculative or exaggerated fears or after-the-fact rationalizations. *Knight*, 797 F.3d at 945; *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 533 (11th Cir. 2013).

In the instant action, the Department contends that its half-inch-beard limitation furthers interests that can be divided into five categories. On the whole, the interests are compelling. *See Holt*, 574 U.S. at 365-66 (holding government had a compelling interest in preventing prisoners from concealing contraband and disguising their identities); *Knight*, 797 F.3d at 944 (holding government had compelling interests in security, discipline, hygiene, and safety); *Linehan v. Crosby*, 346 F. App'x 471, 473 (11th Cir. 2009) (unpublished) (holding government has a compelling interest in keeping costs down). However, the half-inch-beard policy furthers these interests only marginally, and the policy is not the least restrictive means of furthering the interests. To demonstrate, the Court evaluates the Defendant's concerns and interests in turn.

***1. Contraband Arguments and Considerations***

The first interest is security. Clearly, Officers must be able to find any contraband in an inmate's possession. The Department says an inmate can hide contraband in a beard longer than half an inch. Importantly, however, whether a prisoner has a half-inch beard, as permitted by Defendant, or a longer beard, as requested by Plaintiff in his RLUIPA challenge, the prisoner will still be subject to search. Currently, Plaintiff's permitted half-inch beard is searched by the Department through a process that requires Plaintiff, like all other Florida inmates, to run his hands through his beard. This process takes only a couple of seconds. (2/2/26 Tr., S. Scott, 94:2-3.) The

Department is also in possession of metal-detecting wands and uses these wands on beards to detect any metal contraband. As testified by the Department's expert, Brian Zawilinski, metal-detecting wands are effective in detecting metal contraband and do not take much time to use. (2/2/26 Tr., S. Scott, 93:17-23; B. Zawilinski: 69:16-23.)

At trial, Mr. Kirkland[3] testified regarding search procedures and overall security concerns at Florida correctional facilities. (2/2/26 Tr., C. Kirkland, 168:9-10; 169:5-7.) When asked about incidents involving grooming or contraband within a beard, Mr. Kirkland cited only to incidents in other jurisdictions, such as Virginia and Georgia. (2/2/26 Tr., C. Kirkland, 171:20-25 **([Q]:** Okay. What kind of incidents have you encountered involving the grooming or with, you know, the beard with the contraband? […] **[A:]** There's been incidences in other jurisdictions that we've seen over the years with – and I mentioned it my declaration the issue in Virginia […]); 2/2/26 Tr., C. Kirkland, 172:5-14.) Despite being unable to identify any incidents in Florida involving contraband concealed in beards, Mr. Kirkland testified that the Department has developed and implemented a search process for Muslim inmates who have been granted RLUIPA exemptions and permitted to grow longer beards. He testified that the process, which includes combing through beards, has proven effective, with no reported incidents. (2/2/26 Tr., C. Kirkland, 204:8-16.)

Mr. Kirkland testified that the search procedure is not only effective but that he has no reason to believe the same procedure would not be effective for Plaintiff. (2/2/26 Tr., C. Kirkland, 204:8-16.) Because Mr. Kirkland testified that effective search procedures have been implemented for inmates granted RLUIPA exemptions, and that those same procedures can be applied to Plaintiff with equal effectiveness, the inquiry into the risk of contraband concealed in a beard ends

[3] Carl Wesley Kirkland, Jr. ("Mr. Kirkland") is the Deputy Director of Institutional Operations for the Florida Department of Corrections ("FDC"). He has held this position since January 2017. His duties as Deputy Director include oversight of all security matters within the FDC amongst other things. (*See* DE 54-2.)

there. Accordingly, the Court finds that the search process developed for longer beards protects the Defendant's compelling governmental interest in preventing contraband while accommodating Plaintiff's sincerely held religious beliefs, and it is the least restrictive means of doing so.

The Court further notes for the record that no testimony presented at trial established that Plaintiff has ever been in possession of dangerous contraband.[4] Additionally, Plaintiff has not received any disciplinary reports for violent behavior since he has been incarcerated, which has spanned more than eight years. Moreover, the Department's own witness, Mr. Kirkland, testified that contraband can be hidden in clothing, shoes, body cavities, and an inmate's hair. (2/2/26 Tr., C. Kirkland, 190:20-25; 191:1-2.)

On this note, the Court finds that concerns regarding contraband are more salient with respect to clothing, shoes, body cavities, and hair. Male inmates are permitted to have hair on their heads, and the Grooming Policy does not define a maximum length for head hair, although it does provide that such head hair may be "medium" length, thereby exceeding the one-half inch limit currently imposed on beards. (2/2/26 Tr., S. Scott, 97:4-17; 2/2/26 Tr., C. Kirkland, 191:15-20; 2/3/26 Tr., B. Zawilinski: 66:24-25.) An inmate can conceal contraband in the hair on their head more easily than in a beard. As testified by the Department's expert, "[i]t's harder to conceal in a beard than a full head of hair." (2/3/26 Tr., B. Zawilinski: 68:19.) Perhaps more telling is that Plaintiff has been granted a religious accommodation by the Department to wear a *kufi* on his head, which could more easily conceal contraband than a beard. Nevertheless, Plaintiff has been permitted to wear a *kufi* and has never received any disciplinary violations for concealing contraband in it. (2/2/26 Tr., S. Scott, 66:1-8; 96:9-15; 2/2/26 Tr., C. Kirkland, 191:21-24; 203:14-

---

[4] At trial, a disciplinary report was introduced that indicated Plaintiff was found in possession of a cell phone in 2022. (2/2/26 Tr., S. Scott 46:1-13; Plaintiff Trial Exhibit 14.) While the Court notes this infraction, it finds that it does not affect the Court's ultimate findings in this case.

17 (**[Q:]** Okay. And since he's been granted the religious accommodation of having his *kufi*, no contraband has been found there either, right? **[A:]** Correct.).)

As pointed out in *Sims*:

> The point of hiding contraband is to hide it. Contraband in a beard may fall out and thus may be discovered by other inmates or by officers, with or without a search. An inmate is much more likely to put valuable or dangerous contraband in a shoe, a sock, or another more secure location already available to him. Despite that greater risk, and as the Supreme Court noted in *Holt*, 135 S. Ct. at 865-66, correctional authorities do "not require inmates to go about bald, barefoot, or naked."

*Sims*, 400 F. Supp. 3d at 1277, *aff'd sub nom. Sims v. Sec'y, Fla. Dep't of Corr.*, 75 F.4th 1224 (11th Cir. 2023). Based on the foregoing analysis, this Court likewise rejects the purported security concerns Defendant raises regarding potential contraband in a beard.

***2. Uniformity Arguments and Considerations***

RLUIPA is applied to the individual claimant, and prison-wide policies or generalized implications are not controlling in this analysis. *See Holt*, 574 U.S. at 363. Defendant raises concerns about potential disruption if uniformity is not maintained among all prisoners, arguing that allowing an inmate to grow a longer beard could be perceived as "preferential treatment." (*See* DE 54 – Def.'s Mot. for Summ. J.; *see also* DE 54.2, Ex. A – Kirkland Decl.) Defendant further asserts that permitting Plaintiff to grow a longer beard would likely require extending the same accommodation to all prisoners to uphold uniformity and reduce the potential disruptiveness. (*Id.*)

Similar uniformity arguments were addressed in *Sims*. That court held that, while uniformity is important, it does not constitute a compelling governmental interest. *Sims*, 400 F. Supp. 3d at 1277. In support of its position, the *Sims* court explained:

> The whole point of RLUIPA is to require accommodation of religion—to allow an inmate an exception to an otherwise-uniform policy that substantially burdens the inmate's religious exercise. A government's interest in uniformity, without more, is rarely compelling enough to defeat a RLUIPA claim. And in any event, the

> Department has itself identified a viable alternative that achieves its interest in uniformity: the Department can allow every inmate the option of having a fist-length beard.

*Id*. In sum, the court held that uniformity is not a compelling interest and that prohibiting the prisoner from exercising his religion by growing a fist-length beard is not the least restrictive means of advancing any interest in uniformity. *Id*.

Moreover, the Department's uniformity argument fails because the Department has already granted Plaintiff a religious accommodation by allowing him to wear a *kufi*, and there has been no resulting civil unrest among the prisoner population, as the Department contends would occur if Plaintiff were granted an exemption to grow his beard on the ground that it would disrupt uniformity. (2/2/26 Tr., S. Scott, 65:21-22; 66:1-5; 95:18-19; 96:6-8; 2/2/26 Tr., C. Kirkland, 198:1-4 (**[Q:]** But you don't always maintain that uniformity, correct? There are exceptions, religious exceptions, for example, *kufis*? **[A:]** Correct.).) For the reasons discussed above, Defendant's uniformity arguments in the present case fail, and its Grooming Policy is not the least restrictive means of furthering that interest.

***3. Inmate Identification Arguments and Considerations***

With respect to inmate identification, Defendant raises concerns that growing a longer beard could hinder identification because a longer beard may conceal facial scars or markings, cause a prisoner's appearance to differ from his identification card at any given time, or allow a prisoner to alter his appearance by growing or shaving his beard, potentially evading identification after engaging in misconduct. (*See* DE 54 – Def.'s Mot. for Summ. J.; *see also* DE 54.2, Ex. A – Kirkland Decl.)

These same considerations were addressed in *Sims*. With respect to facial scars and markings, the *Sims* court noted that even before *Holt*, similar arguments were raised, namely that

facial markings could not be seen through one-half-inch beards. *Sims*, 400 F. Supp. 3d at 1278. The court rejected this argument, holding that such concerns, and the resulting prohibition on growing a beard for religious exercise, were not the least restrictive means of furthering any interest in identifying inmates through facial scars, tattoos, or other markings. *Id*. Here, Plaintiff has only one facial scar, located on his upper lip. Because Plaintiff seeks to trim his mustache, that scar would in fact become more visible. Accordingly, this concern is not applicable to Plaintiff in this case. (2/2/26 Tr., S. Scott, 91:11-19.)

With respect to concerns regarding a prisoner's identification card, the court in *Sims* noted that the solution is straightforward: take an updated photograph. The court held that this dual-photograph method constitutes a less restrictive alternative. *Sims*, 400 F. Supp. 3d at 1278. Notably, here, the Department already has photographs of Plaintiff in both a fully clean-shaven state and with the permitted half-inch beard, and it can take an additional photograph reflecting the beard permitted under Plaintiff's RLUIPA claim as set forth herein. (2/2/26 Tr., S. Scott, 93:7-9.)

Finally, regarding inmates who might alter their appearance by shaving a longer beard after engaging in misconduct, the solution is again straightforward: use dual photographs. *Sims*, 400 F. Supp. 3d at 1279. One photograph would capture the inmate with a shaved beard, and another would capture the inmate with the longer beard. *Id*. Based on the foregoing, Defendant's identical arguments to those raised in *Sims* fail, and Defendant's Grooming Policy is not the least restrictive means of advancing Defendant's asserted interest.

***4. Resource Arguments and Considerations***

The Department's arguments concerning its limited resources are entitled to little weight in this case. Finally, with respect to Department resources, Defendant raises concerns that the additional time and effort required to search prisoners with longer beards would place an undue

burden on its resources. (*See* DE 54 – Def.'s Mot. for Summ. J.; *see also* DE 54.2, Ex. A – Kirkland Decl.) Identical arguments were raised in *Sims*. There, the court acknowledged that Department resources constitute a compelling governmental interest and recognized that every dollar matters. *Sims*, 400 F. Supp. 3d at 1279. Nevertheless, the court held that the impact would not be as significant as the Department contended, stating: "[b]ut allowing fist-length rather than half-inch beards will have very little effect on Department resources. A few more seconds to search an inmate. Perhaps a few more photographs." *Id*.

Furthermore, the *Sims* court rejected the notion that searching a prisoner with a longer beard would take an additional four or five minutes. The same reasoning applies here. After all, the Department's own fact witness, Mr. Kirkland, conceded that searching Plaintiff's beard would take only an additional *five to six seconds*. Accordingly, allowing Plaintiff to grow a beard will have little, if any, effect on Department resources. (2/2/26 Tr., C. Kirkland 195:7-25.) Considering the foregoing, Defendant's argument on this point fails, and its Grooming Policy is not the least restrictive means of advancing Defendant's asserted interest.

## IV. CONCLUSION[5]

Plaintiff has satisfied all the elements required for a permanent injunction barring the FDOC from enforcing the grooming policy against him. Plaintiff is an observant Muslim. He wishes to grow a beard in accordance with his religion, and allowing him to do so would pose no security, misconduct, or flight risk. The Defendant has not shown that prohibiting Plaintiff from growing a fist-length beard and trimming his mustache is the least restrictive means of furthering

[5] *Sims*, 400 F. Supp. 3d at 1278 ("It bears noting, too, that the Department's half-inch-beard policy places the Department squarely in the minority. The majority of states, the Federal Bureau of Prisons, and the District of Columbia all allow prisoners to grow fist-length beards, either across the board or as a religious accommodation. There is no evidence that any significant harm has resulted.")

a compelling government interest. Consequently, Plaintiff has the right under RLUIPA to do these things. If Plaintiff abuses the right, however, he may forfeit this right.

Based on the findings of fact and conclusions of law set out in this order, it is

**ORDERED** that:

1. The Defendant, Secretary of the Florida Department of Corrections, must allow the Plaintiff, Sean Westley Scott, to grow a fist-length beard and to trim his moustache as he alternatively requested in accordance with his religious beliefs.

2. This injunction binds the Secretary and his officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise; and

3. The Clerk shall enter judgment and close the file.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 17th day of August, 2026.

**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**